[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-13776

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BRANDON ROMEL DUPREE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cr-00013-PGB-DCI-1

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges.

JILL PRYOR, Circuit Judge, delivered the opinion of the Court, in which WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, NEWSOM, LAGOA, and BRASHER, Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion.

GRANT, Circuit Judge, filed an opinion concurring in the judgment.

LUCK, Circuit Judge, filed a dissenting opinion, in which BRANCH, Circuit Judge, joined.

JILL PRYOR, Circuit Judge:

This appeal requires us to consider whether an inchoate offense qualifies as a "controlled substance offense" for purposes of the career offender sentencing enhancement under the United States Sentencing Guidelines. U.S. Sent'g Guidelines Manual § 4B1.2(b) (U.S. Sent'g Comm'n 2018). In this case, the district court sentenced Brandon Dupree as a career offender based partly on his conviction for conspiring to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. Dupree appealed his sentence, arguing that his § 846 conspiracy conviction could not serve as a predicate for his career offender enhancement because the Guidelines' definition of "controlled substance offense" omitted conspiracy and other inchoate crimes.

A panel of this Court affirmed Dupree's sentence, concluding that our decisions in *United States v. Weir*, 51 F.3d 1031 (11th Cir. 1995), and *United States v. Smith*, 54 F.3d 690 (11th Cir. 1995), foreclosed his argument. *United States v. Dupree*, 849 F. App'x 911 (11th Cir. 2021) (unpublished), *reh'g en banc granted, opinion vacated* 25 F.4th 1341 (11th Cir. 2022). We granted Dupree's petition to rehear the case en banc. After careful consideration, and with the benefit of oral argument, we hold that the definition of "controlled substance offense" in § 4B1.2(b) does not include inchoate offenses. We therefore vacate Dupree's sentence and remand to the district court for resentencing.

## I.    BACKGROUND

Dupree pled guilty to one count of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); one count of conspiracy to possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 846; and one count of carrying a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Before his sentencing, a probation officer prepared a Presentence Investigation Report ("PSR"). The PSR reported that Dupree had two previous convictions for controlled substance offenses. The PSR considered Dupree's § 846 conspiracy conviction to be his third controlled substance offense. Together, these three offenses qualified Dupree for the career offender enhancement under § 4B1.1(a) of the Sentencing Guidelines.

Applying the enhancement, the PSR assigned Dupree a total offense level of 29 with a criminal history category of VI, for a range of 151 to 188 months of imprisonment under the Guidelines. In addition, Dupree was required to serve a consecutive 60-month term of imprisonment for the carrying a firearm count. *See* 18 U.S.C. § 924(c). After adding the mandatory minimum consecutive penalty required by § 924(c), Dupree's guidelines range was 211 to 248 months of imprisonment.

Without the enhancement, Dupree's guidelines range would have been lower. He would have had an offense level of 23 with a criminal history category of V, resulting in a guideline range of 84 to 105 months' imprisonment. After adding the mandatory minimum penalty required by § 924(c), his guidelines range would have been 144 to 165 months' imprisonment.

Dupree objected to the enhancement, arguing that inchoate crimes[1] such as his § 846 conspiracy conviction did not qualify as a controlled substance offense.[2] He argued that without his § 846 conspiracy conviction serving as his third qualifying offense he could not be sentenced as a career offender. The district court

---

[1] Inchoate crimes involve "[a] step toward the commission of another crime, the step in itself being serious enough to merit punishment." *Inchoate Offense*, Black's Law Dictionary (11th ed. 2019). "The three inchoate offenses are attempt, conspiracy, and solicitation." *Id.*

[2] Dupree also objected to the PSR's classification of his two prior state drug convictions as controlled substance offenses. The district court overruled the objection, and Dupree did not pursue the issue on appeal.

overruled Dupree's objection and applied the enhancement. Based on considerations including Dupree's youth and difficult upbringing, as well as his serious medical conditions including paralysis from waist down, the district court varied downward from the guideline range and sentenced Dupree to 106 months' imprisonment.

On appeal, Dupree renewed his argument that his § 846 conspiracy conviction did not count as a controlled substance offense. He pointed to the plain language of § 4B1.2, which omitted inchoate offenses from the definition of "controlled substance offense." He acknowledged that the commentary to § 4B1.2—specifically Application Note 1—included inchoate crimes in the definition. But he argued that Application Note 1 was unenforceable because it was inconsistent with § 4B1.2's plain text.

The panel rejected Dupree's argument. *Dupree*, 849 F. App'x at 912. It relied on *Weir*, in which "we held that conspiracy to possess with intent to distribute marijuana was a controlled substance offense within the meaning of the career offender enhancement." *Id.* (citing *Weir*, 51 F.3d at 1031–32). The panel further noted that in *Smith*, decided after *Weir*, we "held . . . that [A]pplication [N]ote 1 to . . . § 4B1.2 'constitutes a binding interpretation of the term controlled substance offense.'" *Id.* (quoting *Smith*, 54 F.3d at 693). This precedent, the panel concluded, bound it to affirm Dupree's sentence. *Id.*

Dupree petitioned for, and we granted, rehearing en banc to revisit our precedent.

## II.     STANDARD OF REVIEW

"We review *de novo* the interpretation and application of the Sentencing Guidelines." *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020).

## III.     DISCUSSION

Dupree argues that he was not a career offender under the Guidelines. A defendant is considered a career offender for purposes of sentencing if, among other things, the defendant "has at least two prior felony convictions of either a crime of violence or a controlled substance offense" and his "instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense." U.S. Sent'g Guidelines Manual § 4B1.1(a). Dupree concedes that his prior state drug convictions qualified as controlled substance offenses. But he argues that his § 846 conspiracy conviction does not count as the required third predicate offense because it was not a controlled substance offense. Section 4B1.2 provides:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense.

*Id.* § 4B1.2(b). The commentary in Application Note 1 to § 4B1.2 adds that the term "'controlled substance offense' include[s] the

offenses of aiding and abetting, conspiring, and attempting to commit such offenses." *Id.* § 4B1.2(b) cmt. n.1.

Dupree contends that his § 846 conspiracy conviction is not a controlled substance offense because § 4B1.2(b)'s "controlled substance offense" definition unambiguously excludes inchoate offenses. Because the Guideline is unambiguous, he argues, we must not defer to the commentary's broader definition of controlled substance offense to include inchoate offenses.[3] We agree. We begin

---

[3] This question has sharply divided our fellow circuits. The Third and Sixth Circuits sitting en banc, along with panels of the Fourth and D.C. Circuits, have held that inchoate crimes do not qualify as controlled substance offenses under the Guideline. *See United States v. Campbell*, 22 F.4th 438, 440 (4th Cir. 2022) ("Because the Sentencing Guidelines' definition of a 'controlled substance offense' does not include an attempt crime, we must vacate the enhanced sentence[.]"); *accord United States v. Nasir*, 17 F.4th 459, 468–72 (3d Cir. 2021) (en banc); *United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc); *United States v. Winstead*, 890 F.3d 1082, 1090–91 (D.C. Cir. 2018). Panels of the First, Second, Seventh, and Ninth Circuits, and the Eighth Circuit sitting en banc, have reached the opposite conclusion. *See United States v. Smith*, 989 F.3d 575, 585 (7th Cir.) ("We conclude[] that § 4B1.2's Application Note 1 is authoritative and that 'controlled substance offense' includes inchoate offenses."), *cert. denied*, 142 S. Ct. 488 (2021); *United States v. Lewis*, 963 F.3d 16, 21–24 (1st Cir. 2020); *United States v. Richardson*, 958 F.3d 151, 154–55 (2d Cir. 2020); *United States v. Crum*, 934 F.3d 963, 965–67 (9th Cir. 2019); *United States v. Mendoza-Figueroa*, 65 F.3d 691, 694 (8th Cir. 1995). But the First and Ninth Circuit panels suggested their decisions might have been different if they were not constrained by their circuits' prior precedent. *See Lewis*, 963 F.3d at 25 ("None of this is to say how we would rule today were the option of an uncircumscribed review available. That the circuits are split suggests that the underlying question is close."); *Crumb*, 934 F.3d at 966

with the framework the Supreme Court has established for determining how the Guidelines' commentary impacts the interpretation of the Guidelines. We then use that framework to interpret § 4B1.2(b). We conclude by applying our ruling to Dupree's case.

## A.    The Commentary Cannot Expand the Interpretation of Unambiguous Sentencing Guidelines.

The Supreme Court examined whether courts are bound by the commentary's interpretation of the Guidelines in *Stinson v. United States*, 508 U.S. 36 (1993). The Court began by explaining that "[t]he Sentencing Reform Act of 1984 . . . created the Sentencing Commission . . . and charged it with the task of establishing sentencing policies and practices for the Federal criminal justice system." *Id.* at 40–41 (alterations adopted) (internal quotation marks and citations omitted). "The Sentencing Commission promulgate[d] the [G]uidelines by virtue of an express congressional delegation of authority for rulemaking" just as federal administrative agencies promulgate regulations. *Id.* at 44. The Court then analogized the Guidelines' commentary to "an agency's interpretation of its own legislative rules." *Id.* at 45 ("[T]he [G]uidelines are the equivalent of legislative rules adopted by federal agencies. . . . [T]his type of commentary is akin to an agency's

("If we were free to do so, we would follow the Sixth and D.C. Circuits' lead."). The Fifth Circuit recently vacated its decision holding that a defendant's conspiracy convictions qualified as controlled substance offenses and will address this question en banc. *See United States v. Vargas*, 35 F.4th 936, 938–940 (5th Cir.), *reh'g en banc granted, opinion vacated* 45 F. 4th 1083 (5th Cir. 2022).

interpretation of its own legislative rules."). Guided by this analogy, the Court determined that the commentary should receive the same level of deference given to an agency's interpretation of its own rules, deference the Court first described in *Bowles v. Seminole Rock & Sand Co. Id.*

*Seminole Rock* instructed that when considering how to treat an issuing agency's interpretation of a regulation, a court initially should consider whether "the meaning of the [regulation] is in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). If the meaning is in doubt—if the regulation is ambiguous—the court can then consider the issuing agency's interpretation of the regulation. *Id.* At that point, the court should afford the agency's construction of its own regulation "controlling weight" unless it is "plainly erroneous or inconsistent with the regulation." *Id.*

Relying on its decision in *Seminole Rock*, in *Stinson* the Supreme Court treated the Sentencing Commission's commentary to the Guidelines like an agency's interpretation of its own regulation: "it must be given 'controlling weight unless it is plainly erroneous or inconsistent with'" the Guideline's text. *Stinson*, 508 U.S. at 45 (quoting *Seminole Rock*, 325 U.S. at 414). The Court explained that the Sentencing Commission could resort to the commentary to interpret the Guidelines only "if the [G]uideline which the commentary interprets will bear the construction." *Id.* at 46. When the "commentary and the [G]uideline it interprets are inconsistent in that following one will result in violating the dictates of the other,

the Sentencing Reform Act itself commands compliance with the [G]uideline." *Id.* at 43.

Four years after *Stinson*, the Supreme Court reaffirmed *Seminole Rock* in *Auer v. Robbins*, 519 U.S. 452 (1997). In *Auer*, the Court concluded that the Secretary of Labor's interpretation of a regulation issued by the Department of Labor was "controlling" because it was not "plainly erroneous or inconsistent with the regulation." *Id.* at 461 (internal quotation marks omitted).

A few years ago, the Supreme Court revisited *Auer* deference[4] and clarified the proper application of the doctrine. In *Kisor v. Wilkie*, the Supreme Court examined *Auer* deference in the context of an administrative agency's (the Department of Veterans Affairs (VA)) interpretation of one of its regulations. 139 S. Ct. 2400, 2408–09 (2019). The Court reaffirmed *Auer*'s "important role in construing agency regulations" while also "reinforc[ing] its limits" and "cabin[ing] . . . its scope." *Id.* at 2408. It explained that *Auer* was "rooted in a presumption . . . that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities." *Id.* at 2412. Therefore, the Court clarified, "only if a regulation is genuinely ambiguous" should *Auer* deference be

---

[4] Since the Supreme Court's decision in *Auer*, courts have referred to the doctrine of deference to an administrative agency's interpretation of its regulations as both "*Seminole Rock*" and "*Auer*" deference. For consistency, we use *Auer* throughout this opinion.

applied. *Id.* at 2414. To determine whether ambiguity exists, courts first "must exhaust all the 'traditional tools' of construction." *Id.* at 2415 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). "If uncertainty does not exist" after applying these tools, "there is no plausible reason for deference." *Id.*

The Supreme Court did not overrule *Stinson* in *Kisor*, and *Kisor* did not concern the Sentencing Guidelines. So our task is to figure out how to read *Stinson* and *Kisor* together. And we think the only way to harmonize the two cases is to conclude that *Kisor*'s gloss on *Auer* and *Seminole Rock* applies to *Stinson*.

In *Kisor*, the Supreme Court answered the question whether it was overruling *Auer* or *Seminole Rock* with a firm "no." *Id.* at 2408. But the Court nonetheless took to task *Seminole Rock*'s "most classic formulation of the [deference] test," which asks "whether an agency's construction is 'plainly erroneous or inconsistent with the regulation.'" *Id.* at 2415 (quoting *Seminole Rock*, 325 U.S. at 414). The majority criticized this language "in a vacuum," as suggestive of "a caricature of the doctrine, in which deference is reflexive." *Id.* (internal quotation marks omitted). Instead, the majority said, courts must consider the nature and context of the agency interpretation, and "[f]irst and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* The Court declared, in no uncertain terms, that "[i]f uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.*

We fail to see how this clarification does not apply to the Sentencing Guidelines. *Stinson* adopted word for word the test the *Kisor* majority regarded as a "caricature," so the continued mechanical application of that test would conflict directly with *Kisor*. Even if *Stinson*'s application of the test was more considerate of the nature and context of the Sentencing Commission's commentary to the Guidelines[5] than other cases were in applying the test to agency interpretations of regulations, if "uncertainty does not exist" in the Guideline, *Kisor* says we may not defer.

*Kisor* did not distinguish between an agency's interpretation of its own regulations and the commentary's interpretation of the Guidelines. This is perhaps unsurprising given that *Kisor* concerned the VA's interpretation of a VA regulation rather than the

---

[5] In *Stinson*, the Supreme Court discussed different analogies to the legal force of Guidelines commentary, the unique role of the Sentencing Commission, and how the commentary is promulgated. *See Stinson*, 508 U.S. at 43–46. In her concurrence, Judge Grant relies on some of this discussion to support her argument that because the Sentencing Commission is different from administrative agencies and the Guidelines commentary is different from these other agencies' rule interpretation, *Kisor*'s gloss on *Auer* deference does not apply. *See, e.g.*, Grant Concurrence at 5–7 (citing *Stinson*'s observation that an analogy to an agency's construction of a federal statute that it administers is inapposite). We note that much of this discussion led to *Stinson*'s conclusion that "[a]lthough the analogy is not precise because Congress has a role in promulgating the guidelines, we think the Government is correct in suggesting that the commentary be treated as an agency's interpretation of its own legislative rule." *Stinson*, 508 U.S. at 44. And the discussion that followed did not alter this conclusion.

19-13776                Opinion of the Court                13

Sentencing Commission's commentary to the Guidelines. But *Kisor* had no need to make this distinction because *Stinson* had instructed "that the commentary be treated as an agency's interpretation of its own legislative rule." *Stinson*, 508 U.S. at 44. Consistent with *Stinson*'s instruction about how the Guidelines commentary should be treated, a footnote to the historical background section in *Kisor* included *Stinson* alongside administrative agency cases in a list of "(pre–*Auer*) decisions applying *Seminole Rock* deference." *Kisor*, 139 S. Ct at 2411 n.3.[6]

  *Stinson* adopted *Seminole Rock*'s formulation of agency deference. *See Stinson*, 508 U.S. at 45 ("[C]ommentary is akin to an agency's interpretation of its own legislative rules. As we have often stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" (quoting *Seminole Rock*, 325 U.S. at 414)). A few years later, *Auer* reaffirmed the same test. *Auer*, 519 U.S. at 461. More recently, *Kisor* declined to overrule *Auer* and *Seminole Rock*, but it "reinforce[d] [the] limits" and

---

[6] Our dissenting and specially concurring colleagues point out that the footnote appeared in a section of the opinion that did not garner a majority. Dissent at 10; *see also* Grant Concurrence at 9. They are correct about that, but they misread our observation about the footnote. We do not read the footnote as overruling or abrogating *Stinson*. Instead, we see the footnote as "[c]onsistent with," *supra* at 12–13, our view that when deciding *Kisor* the Supreme Court considered the deference question in *Stinson* to be no different in kind from deference in administrative agency cases.

19-13776                Opinion of the Court                14

"cabined . . . [the] scope" of *Auer* deference, with the primary rule being no deference without ambiguity. *Kisor*, 139 S. Ct. at 2408. And it took note of *Stinson* as one of the Court's "legion" *Seminole Rock* cases that pre-dated *Auer. Id.* at 2411 n.3. So it follows that *Kisor*'s clarification of *Auer* deference applies to the Guidelines and its commentary. The dissent argues that by applying *Kisor*'s clarification to *Stinson* we have set aside *Stinson*'s command that commentary "that interprets or explains a guideline is authoritative," unless it violates the law or is plainly erroneous. Dissent at 3–6 (quoting *Stinson*, 508 U.S. at 38). According to our dissenting colleague, we have "essentially overruled *Stinson.*" *Id.* at 3; *see* Grant Concurrence at 1, 9. To the contrary, we honor *Stinson*'s instruction to "treat[]" the commentary "as an agency's interpretation of its own legislative rule." *Stinson*, 508 U.S. at 44.

As we have explained, when *Stinson* was decided, *Seminole Rock* held that an agency's interpretation of its own rule was "controlling" unless it contravened the rule itself or was plainly erroneous. *Seminole Rock*, 325 U.S. at 414. Thus, *Stinson*'s conclusion that the commentary is authoritative and entitled to deference is a result of treating the commentary as an agency's interpretation of its own rule. To follow *Stinson*'s instruction to treat the commentary like an agency's interpretation of its own rule, we must apply *Kisor*'s clarification of *Auer* deference to *Stinson*. We have not ignored *Stinson* or treated it as having been overruled—rather, it directs us to *Seminole Rock* and *Auer*, as clarified by *Kisor*.

We agree, of course, with the dissent that "[t]he Supreme Court doesn't upend decades of precedent through silence." Dissent at 8. But the Supreme Court has not been silent. It has spoken directly to the issue of whether the Guidelines and its commentary, on the one hand, and an agency's rules and its interpretation of those rules, on the other hand, should be treated differently and concluded they should be treated the same. Our conclusion today flows not from the Supreme Court's silence, but from its affirmation that the commentary should be treated the same as the agencies' interpretations that were at issue in *Seminole Rock*, and now *Auer* and *Kisor*.[7]

---

[7] Judge Luck observes that "[t]he *Stinson* Court found the analogy to *Chevron* inapposite because commentary explains the [G]uidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice"; from this he argues that we have adopted the deference standard rejected in *Stinson* and thus effectively overruled *Stinson*. Dissent at 5–6 (internal quotation marks and emphasis omitted). First, this statement has no application to the dispute before us because although "commentary may interpret a guideline or explain how it is to be applied," *Stinson*, 508 U.S. at 41 (alterations adopted) (internal quotation marks omitted), it cannot rewrite the Guideline. To view the commentary in the way Judge Luck suggests would allow the commentary to add to, replace, or modify a guideline—things that *Stinson* expressly prohibited. *Id.* at 38, 46; *see Havis*, 927 F.3d at 386; *see also United States v. Rollins*, 836 F.3d 737, 742 (7th Cir. 2016) (Guidelines commentary "are interpretations of, not additions to, the Guidelines themselves; [commentary] has no independent force." (emphasis omitted)). Second, *Stinson* did not outright reject *Chevron* deference, which indeed is similar to the deference standard now articulated in *Kisor*; it rejected the notion that an agency's

With *Kisor*'s refined deference scheme in mind, we turn to whether we should defer to the commentary in Application Note 1, which would supplement § 4B1.2's definition of "controlled substance offense" to include inchoate offenses.

B.    **Section 4B1.2 Unambiguously Excludes Inchoate Offenses, So the Commentary's Interpretation Is Not Binding.**

We begin, as *Kisor* instructs, with the text of § 4B1.2. After applying our traditional tools of statutory interpretation, we conclude that the plain language definition of "controlled substance offense" in § 4B1.2 unambiguously excludes inchoate offenses.

Section 4B1.2(b), entitled "Definitions of Terms used in Section 4B1.1," provides:

> The term "controlled substance offense" *means* an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense.

---

interpretation of a federal statute that it administers is akin to the commentary's interpretation of a Guideline. It was the "analogy" between an agency's interpretation of a statute and the commentary's interpretation of a Guideline that the court found "inapposite," not the resulting deference. *Stinson*, 508 U.S. at 44.

U.S. Sent'g Guidelines Manual § 4B1.2(b) (emphasis added). The definition does not mention conspiracy or attempt or any other inchoate crimes. The exclusion of inchoate crimes from the definition of what the term "means" is a strong indicator that the term does not include those offenses. A "definition which declares what a term 'means' excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (alterations adopted) (internal quotation marks omitted); *see United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc) ("The guideline does not even mention inchoate offenses. That alone indicates it does not include them."); *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018) ("Section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses."). We agree with the en banc Sixth Circuit's observation, in overruling its prior precedent to the contrary, that "[t]o make attempt crimes a part of § 4B1.2(b), the Commission did not interpret a term in the guideline itself—no term in § 4B1.2(b) would bear that construction." *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc). Instead, the Commission purported "to *add* an offense not listed in the [G]uideline." *Id.* (emphasis in original).

The lack of any reference to conspiracy or attempt crimes stands in stark contrast to the other definition found in § 4B1.2. In defining "crime of violence," the Sentencing Commission included "any offense . . . that has as an element the use, *attempted* use, or threatened use of physical force against the person of another." U.S. Sent'g Guidelines Manual § 4B1.2(a)(1) (emphasis added).

With this definition, the Sentencing Commission demonstrated that it knew how to include attempted conduct in addition to the conduct itself when it meant to do so. A drafting body such as the Sentencing Commission "generally acts intentionally when it uses particular language in one section . . . but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015). This "interpretive cannon . . . applies with particular force" where the provision that includes specific language is in "close proximity" to the provision that excludes it. *Id.* at 392. That is true here. The definitions of "crime of violence"—which includes offenses involving the use of physical force as well as the attempted use of physical force—and "controlled substance offense"—which does not include attempt at all—are sister subsections within the same Guideline provision. Because of their proximity, we must infer that the Sentencing Commission intentionally excluded inchoate offenses from the definition of controlled substance offense.[8] *See Nasir*, 982 F.3d. at 471 (explaining that because § 4B1.2(b) "does not even mention inchoate offenses," but § 4B1.2(a) "explicitly include[s] inchoate crimes" in its definition of "crime of violence," § 4B1.2(b) unambiguously omits inchoate crimes).

The government tries to inject ambiguity into § 4B1.2(b) by pointing to the word "prohibits" in the definition of "controlled

---

[8] We acknowledge that § 4B1.2(a)(1)'s definition of crime of violence includes attempted offenses but not conspiracy offenses. Nonetheless, the crime of violence definition demonstrates that the Sentencing Commission knew how to—and of the need to—address inchoate crimes explicitly.

substance offense." *See* U.S. Sent'g Guidelines Manual § 4B1.2(b) ("The term 'controlled substance offense' means an offense . . . that prohibits . . . ."). "Prohibit," the government contends, has multiple meanings that make it ambiguous whether controlled substance offenses include inchoate crimes. Because § 4B1.2(b) is ambiguous, the government argues, we must defer to the commentary in Application Note 1 and add inchoate crimes to the definition of "controlled substance offense." The government relies on *United States v. Lange*, in which we interpreted "prohibit" in § 4B1.2(b). 862 F.3d 1290, 1295 (11th Cir. 2017). Looking to dictionary definitions, we observed that "prohibit" could mean, among other things, "to forbid by a command, statute, law or authority," or "to prevent, hinder." *Id.* (alterations adopted) (internal quotation marks omitted). Rejecting that the meaning was confined to the narrower definition of "prohibit"—to forbid by law—we concluded that "prohibit" also meant to prevent or hinder because of Application Note 1's inclusion of aiding and abetting, conspiracy, and attempt. *Id.* ("Because Application Note 1 tells us that an offense prohibits the manufacture of a controlled substance when it prohibits aiding and abetting, conspiring, and attempting that manufacture, . . . we must not construe 'prohibit' too narrowly." (internal citation omitted)). There are two problems with the government's reliance on *Lange*.

The first problem, of course, is that in *Lange* we considered the commentary in Application Note 1 to be "a binding interpretation of the term controlled substance offense" based on *Smith* and then proceeded to interpret the Guideline light of the commentary.

*Id.* at 1294 (internal quotation marks omitted). So, if *Smith* is wrong, then *Lange* is, too.

The second, more fundamental, problem is that "prohibit" cannot mean "to prevent [or] hinder" in the context of § 4B1.2(b) because under that definition there would be no logical limit to the conduct that would come under the controlled substance offense umbrella. Logically, laws criminalizing many different types of conduct, even conduct not involving drugs, prevent or hinder the manufacture or distribution of drugs. We find the Fourth Circuit's articulation of this problem persuasive. In *United States v. Campbell*, the Fourth Circuit rejected the government's argument that "prohibit" could mean "to prevent or hinder." 22 F.4th 438, 448 (4th Cir. 2022) (alteration adopted) (internal quotation marks omitted). The court explained that "[i]nterpreting 'prohibits' to include anything that makes the outlawed conduct more likely to occur would sweep into criminal statutes a vast swath of conduct based on a secondary dictionary definition." *Id.* And this would result in "controlled substance offense" including such unrelated conduct as "money laundering" and "loitering" because § 4B1.2(b) would have "no logical endpoint." *Id.* at 448–49. We agree with the Fourth Circuit that the "to prevent or hinder" definition of prohibit does not work in the context of § 4B1.2(b), so it cannot render § 4B1.2(b) ambiguous.

Adopting the broader definition of "prohibit" would lead to results that not only are unworkable, but also would contravene Supreme Court precedent. There can be no doubt that laws

forbidding the simple possession of controlled substances prevent or hinder the controlled substance offense of possession with intent to distribute those substances. Under this broader definition of "prohibit," simple possession would meet the definition of a controlled substance offense. But that cannot be right, because the Supreme Court has held the opposite—that a conviction for simple possession does not qualify as controlled substance offense. *Salinas v. United States*, 547 U.S. 188, 188 (2006). "Prohibit," then, must have the narrower, ordinary meaning it carries in the criminal law context: "to forbid by law."

We conclude that the text of § 4B1.2(b) unambiguously excludes inchoate crimes. Under *Kisor*, that concludes our analysis, and we have no need to consider, much less defer to, the commentary in Application Note 1.[9]

---

[9] Today we overrule our prior precedent holding that the commentary in Application Note 1 constitutes a binding interpretation of § 4B1.2(b). Both *Weir* and *Smith* are incongruous with *Kisor*. In *Weir*, we held "that a conviction of conspiracy to possess with intent to distribute marijuana is a 'controlled substance offense' for purposes of career criminal sentence enhancement," but we failed even to acknowledge that the commentary supplemented the plain text of § 4B1.2(b) by adding inchoate crimes. *Weir*, 51 F.3d at 1031. Our failure to examine the plain text of § 4B1.2(b) to determine whether we owed deference to the commentary was irreconcilable with *Stinson*. Shortly after *Weir*, we decided *Smith*, which required us to consider whether a defendant's "prior state conviction for attempted possession with intent to deliver cocaine" constituted a controlled substance offense under § 4B1.2(b). *Smith*, 54 F.3d at 691. This time, we acknowledged *Stinson*'s role in determining whether we should

19-13776                Opinion of the Court                22

## C.    Dupree Is Ineligible for the Career Offender Enhancement.

All that remains is to apply our holding to Dupree's case. Dupree concedes that he meets two of § 4B1.1(a)'s requirements for the career offender enhancement, so application of the enhancement turns on whether his "instant offense of conviction" is "a controlled substance offense." U.S. Sent'g Guidelines Manual § 4B1.1(a). Under today's holding, Dupree's conviction for conspiracy to possess with intent to distribute heroin and cocaine in violation of § 846 is not a controlled substance offense because the plain text of § 4B1.2(b) unambiguously excludes inchoate crimes. Dupree must be resentenced without application of the career offender enhancement.

---

defer to the commentary's addition of inchoate crimes to the definition of controlled substance offense. *Id.* at 693. We concluded that deference was appropriate because the commentary was not "inconsistent with, or a plainly erroneous reading of, sections 4B1.1 or 4B1.2." *Id.* This conclusion was incorrect at the time. Under *Stinson*, deference to the commentary was appropriate only "if the [G]uideline which the commentary interprets [would] bear the construction." *Stinson*, 508 U.S. at 46. Because§ 4B1.2(b)'s text excluded inchoate crimes, it could not bear the commentary's addition of those crimes. But regardless of whether *Smith* was wrong at the time, it is now. Its analysis is incompatible with *Kisor*, which requires courts to empty the "legal toolkit" before concluding that a rule is "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415. Accordingly, to the extent our prior decisions held that inchoate crimes are included in the definition of "controlled substance offenses" in § 4B1.2(b), we overrule those decisions today.

## IV.    CONCLUSION

The definition of "controlled substance offense" in § 4B1.2(b) of the Sentencing Guidelines does not include inchoate offenses like conspiracy and attempt. To the extent that this holding conflicts with our prior precedent, that precedent is overruled. The district court erred by sentencing Dupree as a career offender because his conspiracy conviction under 21 U.S.C. § 846 was not a controlled substance offense. We vacate Dupree's sentence and remand for resentencing consistent with this opinion.

19-13776          WILLIAM PRYOR, C.J., Concurring                    1

WILLIAM PRYOR, Chief Judge, concurring:

I join the majority opinion in full because it correctly explains the effect that the decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), has on our precedent *United States v. Weir*, 51 F.3d 1031 (11th Cir. 1995). I write separately to bring attention to a common misconception about the United States Sentencing Commission that has arisen in debates over the relationship between *Kisor* and *Stinson v. United States*, 508 U.S. 36 (1993). Courts and commentators tend to justify treating commentary as less authoritative than the guidelines in part on the ground that "[u]nlike the Guidelines themselves, . . . commentary to the Guidelines never passes through the gauntlets of congressional review or notice and comment." *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc). But their premise is mistaken. Unlike most agency interpretive rules, Guidelines commentary ordinarily goes through the same notice-and-comment and congressional review procedures as substantive Guideline revisions. I agree with the majority that we are bound by *Stinson* to treat the Guidelines and commentary differently despite this similarity. But in the light of our decision today and others like it, the Commission could shore up the authority of its commentary without substantially modifying its practice by moving what normally goes in the commentary to the main text of the Guidelines in future revisions.

The *Stinson* Court held that the Sentencing Guidelines commentary should "be treated as an agency's interpretation of its own legislative rule." 508 U.S. at 44. Administrative agencies usually

19-13776        WILLIAM PRYOR, C.J., Concurring              2

issue their "legislative rules" through a notice-and-comment procedure but need not use that procedure for issuing interpretive rules. *See* 5 U.S.C. § 553(b); *id.* § 553(b)(A). Likewise, the Sentencing Commission must follow the notice-and-comment procedure before amending the Guidelines and must present the amendments to Congress for review. *See* 28 U.S.C. § 994(p), (x). But there is no similar statutory requirement for commentary on the Guidelines: the Commission can modify the commentary without the procedural safeguards Congress requires for Guideline changes.

The conventional wisdom reasons that, in the same way that an agency cannot modify a legislative rule without notice and comment by adopting an unreasonable "interpretation" of an unambiguous existing rule, *Kisor*, 139 S. Ct. at 2415, the Commission cannot dodge the notice-and-comment and congressional review safeguards by creating unreasonable "commentary" on its own unambiguous guidelines. *See, e.g.*, *Havis*, 927 F.3d at 386–87. Indeed, concerns about an end-run around notice and comment have led critics to question whether *any* deference to agency interpretation is appropriate. *See, e.g.*, *Kisor*, 139 S. Ct. at 2434 (Gorsuch, J., concurring in the judgment). But the conventional wisdom misses that, in practice, the Commission ordinarily uses the same procedure to revise the commentary as it does to revise the Guidelines.

The application note at issue is an apt example. The commentary that specifies that section 4B1.2 applies to inchoate controlled-substance offenses was present in a different form in the original manual that went through notice and comment and

19-13776        WILLIAM PRYOR, C.J., Concurring        3

submission to Congress, and its current form was adopted by an amendment that also included guideline revisions and was sent to Congress for review. *See* United States Sentencing Guidelines Manual § 4B1.2 cmt. n.2 (Oct. 1987); Amendments to the Sentencing Guidelines for United States Courts, 54 Fed. Reg. 21348, 21379 (May 17, 1989).

Indeed, "most amended guideline commentary now undergoes notice and comment and submission to Congress." John S. Acton, Note, *The Future of Judicial Deference to the Commentary of the United States Sentencing Guidelines*, 45 HARV. J. L. & PUB. POL'Y 349, 357 (2022). To be sure, the Commission's rules of procedure and the underlying statutes do not *require* that commentary revisions undergo the same process as Guidelines revisions. *See* 28 U.S.C. § 994(x); U.S. SENT'G COMM'N, RULES OF PRACTICE & PROCEDURE 4.3 (2016). But, except for technical edits, the Commission ordinarily sends its commentary revisions through the same process as its Guideline revisions. *See* Acton, *supra*, at 358 (citing recent examples).

In the light of this practice, the difference between the Guidelines and the commentary ordinarily boils down to labels and formatting. So, our holding today that *Kisor* requires courts to give less deference to the Guidelines commentary need not constrain the Commission as much as it may appear. If, for example, the commentary's inclusion of inchoate crimes were added—through the same process the Commission earlier employed—to the definition provided in the main text of section 4B1.2, we would be bound

19-13776        William Pryor, C.J., Concurring            4

to respect it. In the meantime, we are bound by *Stinson*'s holding that they are of different levels of authority.

As an administrative agency within the judicial branch, the United States Sentencing Commission has a "unique composition and responsibilities." *Mistretta v. United States*, 488 U.S. 361, 384 (1989). And unsurprisingly, it does not always operate in the same manner as an executive agency. Federal judges, above all officials, should not assume that it does. Judicial decisions should respect how the Commission, in fact, performs its work lest we create needless uncertainty about the important duty of sentencing criminals.

19-13776        GRANT, J., Concurring in the Judgment        1

GRANT, Circuit Judge, concurring in the judgment:

The majority is certainly correct that a conspiracy crime cannot qualify as a "controlled substance offense" under § 4B1.2(b). The commentary defining that term to include inchoate offenses is simply inconsistent with the guideline text. But we are still bound by *Stinson*, and the majority needlessly abandons that decision to get to today's result.

I understand why our Court and others have thought it necessary to at least consider whether *Stinson*'s deferential posture to the Guidelines commentary still holds after *Kisor*. But in answering that question, we should not—cannot—rewrite the precedents to better match our view of first principles or even to create a more coherent body of law. Instead, "we must apply Supreme Court precedent neither narrowly nor liberally—only faithfully." *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc). If *Stinson* is to be overruled, it is up to the Supreme Court to do it. I respectfully concur only in the judgment.

## I.

Our duty to faithfully apply precedent continues even when (some of) the reasoning for an old Supreme Court decision has been undermined by a new case. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). We leave to that Court "the prerogative of overruling its own decisions." *Id.* So those decisions remain binding precedent until the Supreme Court sees "fit to reconsider them, regardless of whether

19-13776      GRANT, J., Concurring in the Judgment          2

subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998). Here, the controlling precedent is *Stinson v. United States*, 508 U.S. 36 (1993). And as a matter of vertical stare decisis, we are bound to follow that case unless and until the Supreme Court instructs us to do otherwise.

*Stinson*'s approach to deference was firm. It held, in reversing this Court's more searching approach, that the Guidelines commentary is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38. The commentary, *Stinson* informs us, "provides concrete guidance as to how *even unambiguous* guidelines are to be applied in practice"—even when that application "may not be compelled by the guideline text." *Id.* at 44, 47 (emphasis added); *see also United States v. Cingari*, 952 F.3d 1301, 1308 (11th Cir. 2020).

The majority departs from *Stinson*. It does so in an attempt to conform that opinion to *Kisor v. Wilkie*, which either tightened or clarified (depending on whom you ask) the deference required for an administrative agency's interpretation of its own regulation. 139 S. Ct. 2400 (2019). For decades, the Supreme Court had required courts to give "controlling weight" to an agency's interpretation of its own regulations unless the interpretation was "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Auer v. Robbins*, 519 U.S. 452, 461 (1997). But *Kisor* cautioned that this

19-13776      G<small>RANT</small>, J., Concurring in the Judgment            3

approach might be overly "reflexive" and imposed the threshold requirement that the majority now imports into *Stinson*: a court may not defer to an agency's interpretation of its own legislative rule unless that rule remains genuinely ambiguous after the court has exhausted all the traditional tools of construction. *See* 139 S. Ct. at 2415–18. On its own terms, this move has been both celebrated as necessary and denigrated as insufficient. But no matter what one thinks of *Kisor*, the majority extends rather than follows that precedent by applying it to *Stinson* and the Sentencing Guidelines.

Two theories could justify this shift. One is that we, as a Court, have always gotten *Stinson* wrong, and that *Kisor* opened our eyes to our longstanding misreading of that case. The other is that *Kisor* partially overruled *Stinson*, changing the deference owed to the Sentencing Guidelines commentary. Though it is not entirely clear which of these theories the majority adopts, neither stands up to scrutiny.

First, a fair reading of *Stinson* shows that we have not been misinterpreting the opinion: it does not require—or even allow—an ambiguity analysis before consulting the commentary. To the contrary, *Stinson* explicitly rejected a search for ambiguity; it found an analogy to *Chevron* "inapposite" because the commentary, "unlike a legislative rule, is not the product of delegated authority for rulemaking, which of course must yield to the clear meaning of a statute." *Stinson*, 508 U.S. at 44 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9

19-13776      GRANT, J., Concurring in the Judgment              4

(1984)).  The role of the Guidelines commentary is different.  It "explains the guidelines and provides concrete guidance as to how *even unambiguous* guidelines are to be applied in practice."  *Id.* (emphasis added).  So *Stinson* considered and expressly rejected the key limitation on deference that *Kisor* requires.[1]

That leaves the possibility that *Kisor* overruled *Stinson*—or at the very least overruled *Stinson*'s broad deference to the commentary.  The majority initially acknowledges that this did not happen: "The Supreme Court did not overrule *Stinson* in *Kisor*, and *Kisor* did not concern the Sentencing Guidelines."  Maj. Op. at

---

[1] One source of confusion in this area may be a tension within *Kisor* between stare decisis and the articulation of new limits on *Seminole Rock*.  On its own terms, *Kisor* is framed as reinforcing limits "inherent" in *Seminole Rock* rather than treading new ground.  *See* 139 S. Ct. at 2415 & n.4.  This framing is controversial; many have argued that *Kisor* instead transformed *Seminole Rock*'s framework.  *See, e.g.*, *Kisor*, 139 S. Ct. at 2443 (Gorsuch, J., concurring in the judgment) (arguing that the majority reshaped *Seminole Rock* in "new" ways); *id.* at 2448 (Kavanaugh, J., concurring in the judgment) (noting that the majority clarified and narrowed *Seminole Rock*); Ronald A. Cass, *The Umpire Strikes Back: Expanding Judicial Discretion for Review of Administrative Actions*, 73 Admin. L. Rev. 553, 568 (2021) (arguing that the *Kisor* factors "dramatically alter the *Auer* test"); Jeffrey A. Pojanowski, *Neoclassical Administrative Law*, 133 Harv. L. Rev. 852, 856 (2020) (describing *Kisor* as "reformulating" *Seminole Rock* to make it for most purposes "practically indistinguishable from the approach recommended by its critics"); Aditya Bamzai, *Delegation and Interpretive Discretion:* Gundy*,* Kisor*, and the Formation and Future of Administrative Law*, 133 Harv. L. Rev. 164, 190 (2019) (arguing that *Kisor* "all but collapses" *Seminole Rock* deference into *Skidmore* deference).  But setting this debate about *Kisor* aside, *Stinson*'s overt rejection of a threshold ambiguity analysis forecloses an analogous debate for *Stinson*.

19-13776       GRANT, J., Concurring in the Judgment       5

11.  But as the opinion goes on, it effectively disregards its earlier observation, arguing that *Stinson*'s embrace of deference must be understood as a "caricature" of *Seminole Rock* that cannot survive *Kisor*.  Maj. Op. at 11–12 (quoting *Kisor*, 139 S. Ct. at 2415).

The key error that drives this analysis is treating *Stinson* and *Seminole Rock* as if they are interchangeable.  They are not.[2] *Stinson*'s doctrine was unique because the Sentencing Commission is unique.  To start, it is not a traditional administrative agency— the Commission is "judicial in nature" while "the role of other federal agencies is typically executive." *United States v. Moses*, 23 F.4th 347, 355 (4th Cir. 2022).  And the Commission promulgates guidelines, not ordinary administrative rules.  That distinction is fundamental.  Administrative rules exist "not just to inform and guide but also to regulate the broad range of people covered by the particular agency's jurisdiction." *Id.*  The Guidelines, on the other hand, guide courts—they "do not bind or regulate the primary conduct of the public." *Mistretta v. United States*, 488 U.S. 361, 396 (1989).

---

[2] Others have also concluded that *Stinson* and *Seminole Rock* are distinct. *See, e.g.*, *United States v. Moses*, 23 F.4th 347, 356 n. (4th Cir. 2022); *United States v. Riccardi*, 989 F.3d 476, 490 (6th Cir. 2021) (Nalbandian, J., concurring in part and in the judgment).  But the majority is not the first court to make the error of conflating *Stinson* and *Seminole Rock*, either before or after *Kisor*. *See, e.g.*, *Riccardi*, 989 F.3d at 485; *United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018).

19-13776      GRANT, J., Concurring in the Judgment      6

*Stinson* respected and even highlighted this distinction. The Supreme Court acknowledged that the text of the Sentencing Reform Act explicitly referenced the commentary to the Guidelines and determined that it was "binding on the courts," just like the Guidelines. *Stinson*, 508 U.S. at 41–42 (citing 18 U.S.C. § 3553(b)).[3] Only after offering those background principles did it consider "[d]ifferent analogies" that had been "suggested as helpful characterizations of the legal force of commentary." *Id.* at 43. And only after rejecting analogies to both legislative history and *Chevron* did the Court cite to *Seminole Rock*. *Id.* at 44–45. Even then, when comparing the commentary to an agency's interpretation of its own regulation, the Court stressed that the analogy was "not precise." *Id.* at 44. One reason? Because "Congress has a role in promulgating the guidelines"—specifically a six-month statutory period during which that body can review any changes to the Guidelines before they take effect. *Id.*; *Id.* at 41 (citing 28 U.S.C. § 994(p)). And though *Stinson* did not mention it, the Sentencing Commission has unique appointment

---

[3] *United States v. Booker* held that this portion of the Sentencing Act was unconstitutional for reasons unrelated to the commentary. 543 U.S. 220, 245 (2005). More broadly, *Booker* held that neither the commentary nor the Guidelines are truly speaking "binding" on courts. *See United States v. Henry*, 1 F.4th 1315, 1320 (11th Cir. 2021). But for our purposes, the point is that the *Stinson* Court cared that Congress had instructed courts to consider the commentary.

19-13776      GRANT, J., Concurring in the Judgment                    7

requirements, including a minimum number of judges, political diversity, and so on. *See* 28 U.S.C. § 991.

Perhaps in response to the Commission's unique mission and makeup, *Stinson* went beyond ordinary principles of administrative law. For one, it allowed the Commission to effectively overrule judicial interpretations of the Guidelines: "prior judicial constructions of a particular guideline cannot prevent the Commission from adopting a conflicting interpretation." *Stinson*, 508 U.S. at 46. In fact, the Court *explicitly endorsed* using amendments to the commentary to effect a change in interpretation of the overall Guidelines—the Court reasoned that "'Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest.'" *Id.* (quoting *Braxton v. United States*, 500 U.S. 344, 348 (1991)). So *Stinson* embraced a world in which the Commission (not the judiciary) would authoritatively resolve disputes about the Guidelines and the commentary—and could even reject judicial interpretations of the Guidelines by amending the commentary.[4]

---

[4] Evidence of the Supreme Court's preference that the Commission resolve disputes about the Guidelines continues to this day. When the Court recently denied certiorari to resolve a deep circuit split about the very guideline before this Court, two Justices remarked that it is "the responsibility of the Sentencing Commission to address this division." *See Guerrant v. United States*, 142

19-13776        GRANT, J., Concurring in the Judgment                    8

That is not how the Supreme Court treats ordinary administrative agencies. The Court has never held that an agency's reinterpretation of its own legislative rule can override a past judicial construction of that rule. *Cf. Kisor*, 139 S. Ct. at 2433 (Gorsuch, J., concurring in the judgment) (discussing lower court holdings to that effect). So *Stinson* went well beyond ordinary principles of administrative law in at least one area. And follow-on cases applying *Stinson* discuss that case as if it were distinct from *Seminole Rock* and *Auer*. *See Neal v. United States*, 516 U.S. 284, 293 (1996); *United States v. LaBonte*, 520 U.S. 751, 757 (1997); *see also* John S. Acton, Note, *The Future of Judicial Deference to the Commentary of the United States Sentencing Guidelines*, 45 Harv. J.L. & Pub. Pol'y 349, 377–79 (2022). This further suggests that *Stinson* hovers outside the world of ordinary administrative law.

The contrary evidence is rather thin. The majority emphasizes that *Stinson* adopted the government's suggestion that courts should treat the commentary "as an agency's interpretation of its own legislative rule," and claims that today's extension of *Kisor* honors that command. Maj. Op. at 12–14, 12 n.5; *Stinson*, 508 U.S. at 44. But that "command" was not without context. The qualifications within the *Stinson* opinion demonstrate that the Court did not make an unadorned, one-for-one comparison. And even if it had, the *Stinson* Court could not have anticipated (and

S. Ct. 640, 640–41 (2022) (Sotomayor, J., joined by Barrett, J., respecting the denial of certiorari).

19-13776        GRANT, J., Concurring in the Judgment                9

would not have adopted, given the other content in the opinion) the pre-conditions for deference that would later follow. Nothing about *Stinson* suggests that courts should forever index the guidelines to any developments in administrative law, even when such developments contradict *Stinson*'s own reasoning.

One last point: the footnote in *Kisor* that includes *Stinson* in a list of sixteen pre-*Auer* cases "applying *Seminole Rock*" does not shift the analysis. Maj. Op. at 13; *Kisor*, 139 S. Ct. at 2411 n.3 (plurality opinion). Any suggestion that it does amounts to an argument by implication from a string cite in a footnote joined by only a plurality of the Court. We can expect more from the Supreme Court if it intends to overrule one of its own cases.

In short—both in *Stinson* itself and in later cases—the Supreme Court has consistently treated *Stinson*'s holding as something distinct from *Seminole Rock* deference. And because this doctrine is distinct from *Seminole Rock*, it is not altered by *Kisor*'s "gloss." Maj. Op. at 11.

Where does that leave us? Vertical stare decisis requires that we continue treating the commentary's interpretation of the Guidelines as "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38. Even if the guideline is unambiguous. I respectfully disagree with the majority's choice to either rewrite or overrule *Stinson*.

19-13776       GRANT, J., Concurring in the Judgment       10

## II.

My concern is not one of only principle.  The shift in this Circuit's approach to the commentary will significantly alter the district courts' near-constant application of the Sentencing Guidelines.  I also fear that it may unsettle much of our caselaw and lead to inappropriate sentencing disparities—frustrating one of the Guidelines' key purposes.

To be sure, there are serious arguments both from first principles and from policy for extending *Kisor* to *Stinson*—or even for overruling *Stinson* entirely.  I do not mean to stake out a position on what the Supreme Court should do or will do if it ultimately revisits the question of *Stinson*'s scope.  But a change to *Stinson* deference will be disruptive—perhaps extremely so.  And that sort of disruption should be weighed by the Supreme Court as part of its horizontal stare decisis analysis, not invited by our own rejection of vertical stare decisis.

At a bare minimum, courts in this Circuit will now need to perform a *Kisor* inquiry into whether a guideline's text is ambiguous before considering any commentary that interprets the guideline.  Under *Stinson*, commentary could help ensure that courts agreed about a guideline's meaning.  Now, under *Dupree*, courts in this Circuit will inevitably divide over whether they are allowed to consult the commentary at all.

By way of example, consider Application Note 14(B), commentary to U.S.S.G. § 2K2.1.  The guideline applies a four-level

19-13776      GRANT, J., Concurring in the Judgment      11

enhancement whenever the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The commentary interprets this enhancement to apply for drug trafficking offenses where "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." *Id.* § 2K2.1 cmt. n.14(B). So it explains, or perhaps broadens somewhat, the meaning of "used or possessed." We have considered this commentary and its guideline side-by-side without any concern. *See, e.g., United States v. Martinez*, 964 F.3d 1329, 1335 (11th Cir. 2020).

But does it warrant *Kisor* deference? One of our sister circuits has already splintered on this question. A divided panel in the Third Circuit (which has extended *Kisor* to the Sentencing Guidelines) decided after several pages of *Kisor* analysis that deference was appropriate because the guideline was ambiguous. *United States v. Perez*, 5 F.4th 390, 395–99 (3d Cir. 2021). Another judge disagreed, saying that the commentary went beyond the guideline's "zone of ambiguity" and was "invalid as written" under *Kisor*. *Id.* at 404, 402 (Bibas, J., concurring in the judgment) (quotation omitted). Under the majority's new approach, we (and the district courts before us) will now be compelled to wrestle with similar questions for a host of guidelines.

19-13776    GRANT, J., Concurring in the Judgment    12

Of course, disagreement between jurists is not an evil in and of itself—sometimes the system invites it. But in enacting the Guidelines, Congress sought to "avoid excessive sentencing disparities." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quotation omitted); *see also* 28 U.S.C. § 991(b)(1)(B). Now, similarly situated defendants may receive substantially different sentences just because courts cannot agree whether a guideline's text is still sufficiently ambiguous after applying the traditional tools of construction. These disagreements will directly undermine the Guidelines' purposes.

Relatedly, today's holding runs the risk of forcing a full-scale disruption of our Sentencing Guidelines caselaw. Virtually every case that has applied the commentary could be considered presumptively overruled. Thankfully, I do not read the majority to require this approach—though it will be interesting to see whether and how we can avoid it.[5] If the Supreme Court overrules *Stinson* and tells us to reassess all caselaw applying the commentary, then so be it. But the possibility of such sweeping

---

[5] *Kisor* itself expressly denied any intent to "cast doubt on many settled constructions of rules." 139 S. Ct. at 2422. So one might assume that today's extension of *Kisor* will only apply to cases of first impression. And yet, after today's decision, litigants who would prefer not to be bound by our caselaw applying *Stinson* will no doubt argue that it has been overruled—or else urge this Court to take the case en banc to overrule the old application of *Stinson*. We will have to choose between a methodological inconsistency in our "pre-*Dupree*" and "post-*Dupree*" cases, or an upending of our caselaw.

19-13776      GRANT, J., Concurring in the Judgment      13

consequences from today's opinion should prompt us to tread carefully before making that call for ourselves.

In sum, under the majority's new approach, meaningful disagreements about the legitimacy of previously uncontroversial commentary are inevitable. Those disagreements will, in turn, exacerbate the degree of sentencing discrepancies. They will also increase the burden on this Court to provide definitive constructions of the Guidelines. And this whole process will have the end effect of shifting the ultimate responsibility for sentencing policy from the Commission to the courts. That shift undermines Congress's intent, articulated by the Supreme Court, that these disagreements should generally be resolved by the Commission.

### III.

Of course, today's case requires more than establishing the standard for interpreting the commentary; we also need to apply that standard. And though *Stinson* is deferential, that deference is not absolute. If "commentary and the guideline it interprets are inconsistent in that following one will result in violating the dictates of the other," the guideline must prevail. *Stinson*, 508 U.S. at 43. After all, "the Sentencing Reform Act itself commands compliance with the guideline." *Id.*

This is a rare case of true incompatibility between commentary and its underlying guideline. Section 4B1.2 already defines the terms used in U.S.S.G. § 4B1.1. And the definition it provides is comprehensive and clear: "'controlled substance

19-13776        GRANT, J., Concurring in the Judgment        14

offense' means an offense under federal or state law . . . that *prohibits* the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b) (emphasis added).

The commentary expands this definition to include inchoate offenses like attempt and conspiracy. U.S.S.G. § 4B1.2(b) cmt. 1. Though *Stinson* requires that we give the commentary the benefit of the doubt and seek to reconcile it with the guideline, I do not see how this interpretation can stand. The majority does a good job explaining why this piece of commentary flouts its guideline. Maj. Op. at 16–21. I agree with that analysis and will not repeat it here.

I will, however, add some additional discussion on the government's failed attempt to save this commentary with creative dictionary use. It offers that inchoate offenses can fit into the guideline's text if we read "prohibit" as if it actually said "hinder." The first level of support is said to come from Black's Law Dictionary which defines "prohibit" to mean: "1. To forbid by law. 2. To prevent, preclude, or severely hinder." Black's Law Dictionary (11th ed. 2019). And according to the government, inchoate offenses like attempt and conspiracy "hinder," even if they do not outright ban, the underlying conduct covered by the guideline.

That is unsupportable. At the very first step, a sleight-of-hand is necessary to transform "prevent, preclude, or severely

19-13776      GRANT, J., Concurring in the Judgment      15

hinder" into "hinder." "Severely hinder"—particularly when following "prevent" and "preclude"—suggests effectively banning something, not merely impeding it. But the government elides this crucial limitation. What's more, a reader cannot simply pick whatever definition she wishes from a dictionary. "Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." Antonin Scalia & Bryan A. Garner, *Reading Law* 70 (2012). I personally cannot think of any context where "prohibit" naturally means "hinder" (nor does the government provide one). But the fit here is particularly awkward. As every lawyer and citizen knows, criminal law is not suggestive—it either bans conduct or it allows it. In this of all contexts, we should expect the word "prohibit" to have its most ordinary meaning—banning something.

The government's argument is also something of a linguistic puzzle. It does not really argue that inchoate controlled substance offenses *themselves* "hinder" the underlying conduct. For good reason—can we really say that conspiring to commit a drug crime hinders the commission of that drug crime? Instead, the government seems to argue that the *prosecution* of these offenses hinders drug possession. To be sure, the government's prosecution of an offense "hinders" its underlying conduct by making that conduct harder to perform in practice. But the very text of a law "prohibits" the underlying conduct. And the guideline

19-13776    GRANT, J., Concurring in the Judgment    16

doesn't address the secondary effects of prosecution—it only looks at what an offense "prohibits." In effect, the government asks us to add language shifting the guideline's focus to the decision to prosecute (but only for inchoate offenses).

These efforts to harmonize this guideline and its commentary fall short. The government's reading is not just worse than Dupree's—it is plainly erroneous. We have no choice but to hold that the guideline and its commentary are flatly incompatible, and that the enhancement does not apply to Dupree.[6]

★    ★    ★

Because I would reach the same result as the majority while continuing to apply *Stinson* deference, I concur only in the judgment.

---

[6] The narrow policy question of whether inchoate offenses should trigger this particular guideline enhancement may eventually—and appropriately—be decided by the Commission. And perhaps quite soon. The Commission has included consideration of possible amendments to § 4B1.2's categorical approach for "controlled substance offense" in its notice of final priorities for the May 2023 amendment cycle. Final Priorities for Amendment Cycle, 87 Fed. Reg. 67,756, 67,756 (Nov. 9, 2022). But the Commission cannot, on its own, resolve the dispute about what deference courts should give to the commentary. Given the burgeoning circuit split, it appears that only the Supreme Court will be able to answer that question.

19-13776                   LUCK, J., Dissenting                   1

LUCK, Circuit Judge, joined by BRANCH, Circuit Judge, dissenting:

Section 4B1.2(b) of the sentencing guidelines defines "[t]he term 'controlled substance offense'" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). The issue in this case is whether conspiring to possess heroin and cocaine with the intent to distribute them is a "controlled substance offense" under guideline section 4B1.2(b).

For thirty years, the answer was yes. *See United States v. Weir*, 51 F.3d 1031, 1031 (11th Cir. 1995) ("We hold that a conviction of conspiracy to possess with intent to distribute marijuana is a 'controlled substance offense' for purposes of career criminal sentence enhancement under section 4B1.1 of the United States Sentencing Guidelines."). The guideline commentary provided that "'controlled substance offense' include[d] the offenses of aiding and abetting, conspiring, and attempting to" possess controlled substances with the intent to distribute them. U.S.S.G. § 4B1.2(b) n.1. And, under *Stinson v. United States*, 508 U.S. 36 (1993), we owed deference to the commentary as an authoritative and "'binding interpretation' of the term 'controlled substance offense'" because the commentary neither ran "afoul of the Constitution" or "a federal statute," nor was "it inconsistent with, or a plainly erroneous

19-13776                    Luck, J., Dissenting                    2

reading of," the guidelines. *United States v. Smith*, 54 F.3d 690, 693 (11th Cir. 1995) (applying *Stinson* to the commentary in guideline section 4B1.2).

But, today, the majority opinion answers no. Placing our court with the minority of circuit courts, the majority opinion holds that we must ignore the guideline commentary and finds that conspiring to possess heroin and cocaine with the intent to distribute is not a "controlled substance offense."

The majority opinion reaches this result, and overrules thirty years of precedent, because, it says, *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) clarified *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) and *Auer v. Robbins*, 519 U.S. 452 (1997) and the *Kisor* clarification applies to *Stinson* and the guidelines commentary. *Kisor*, the majority opinion explains, clarified that commentary is not authoritative, and we do not defer to it, unless the guideline it interprets is genuinely ambiguous.

I respectfully dissent for two reasons. First, despite what the majority opinion says it is doing, it is not really applying *Kisor*'s clarification to *Stinson*. Under the majority opinion's approach, the *Kisor* clarification applies to *Stinson* the same way a magnifying glass applies to an ant on a sunny day—total annihilation. The majority opinion is actually applying *Kisor* to overrule *Stinson*. But the Supreme Court didn't overrule *Stinson* and we can't overrule a Supreme Court opinion on our own. Only the Supreme Court can do that. Second, even if the majority opinion isn't overruling *Stinson*, the *Kisor* clarification doesn't apply to *Stinson*.

19-13776                LUCK, J., Dissenting                3

*The Majority Opinion Applies* Kisor *to Abrogate* Stinson

The majority opinion says that *Kisor* clarified *Auer* deference and that *Kisor*'s clarification applies to *Stinson* and the guidelines commentary. Maj. Op. at 11, 14. But, by applying *Kisor* to *Stinson*, the majority opinion has essentially overruled *Stinson*.

*Stinson*'s holding couldn't be clearer. It is in the second sentence of the opinion: "We decide that commentary in the [g]uidelines [m]anual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38. Before *Stinson*, "various [c]ourts of [a]ppeals ha[d] taken conflicting positions on the authoritative weight to be accorded to the commentary to the [s]entencing [g]uidelines." *Id.* at 40. Our court, for example, had held "that commentary to the [g]uidelines, though 'persuasive,' [was] of only 'limited authority' and not 'binding' on the federal courts." *Id.* at 39 (quoting *United States v. Stinson*, 957 F.2d 813, 815 (11th Cir. 1992)). But the Supreme Court held that our "conclusion that the commentary now being considered [was] not binding on the courts was error." *Id.* at 42.

*Kisor*, by contrast, applies to the deference owed "to agencies' reasonable readings of genuinely ambiguous regulations." 139 S. Ct. at 2408. There, the Supreme Court "reinforce[d] the limits of *Auer* deference," explaining that "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415, 2423. "If uncertainty does not exist," the Supreme Court

19-13776                 LUCK, J., Dissenting                    4

explained, "there is no plausible reason for deference" and "[t]he regulation . . . just means what it means." *Id.* at 2415.

The majority opinion reads *Kisor* to apply to *Stinson* and the guidelines commentary. The courts, the majority opinion says, must not afford deference to the commentary unless the guideline it explains or interprets is genuinely ambiguous. If, after applying all of the interpretive tools in the toolbox, uncertainty does not exist, then there is no plausible reason for deference to the commentary.

The majority opinion's new deference standard for guidelines commentary overturns and sets aside *Stinson* in two important ways. First, the default position under *Stinson* was that the commentary was authoritative and the presumption was overcome only if the interpretation or explanation violated the law or the guideline would not bear the construction. *See Stinson*, 508 U.S. at 38 (holding that a comment "that interprets or explains a guideline is authoritative *unless* it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline" (emphasis added)). The majority opinion's application of *Kisor* to the commentary flips the presumption of authoritativeness on its head. Under the majority opinion, the commentary is not authoritative—it is owed no deference—unless the guideline is genuinely ambiguous. Ambiguity must exist "[f]irst and foremost" before the courts even consider whether to defer to the commentary. *Kisor*, 139 S. Ct. at 2415.

19-13776                Luck, J., Dissenting                5

Second, the majority opinion's application of *Kisor* to the guidelines commentary overrules and sets aside the standard in *Stinson* for when deference is owed. Under *Stinson*, the courts defer to the commentary unless the commentary violates the law or its reading of the guidelines is plainly erroneous or inconsistent. 508 U.S. at 38. In other words, under *Stinson*, guidelines commentary is binding on the federal courts "if the guideline which the commentary interprets will bear the construction." *Id.* at 46.

But the majority opinion's application of *Kisor* to the commentary sets aside the *Stinson* inconsistency standard. Under the majority opinion's application of *Kisor* to the commentary, we no longer ask whether the guideline will bear the commentary's construction. Instead, we must ask if the guideline is genuinely ambiguous after applying the tools in the legal toolbox. If it's not, then, the majority opinion says, we have no need to consider, much less defer to, the commentary.

Critically, the majority opinion adopts the same ambiguity standard for deference to the commentary that the Supreme Court explicitly rejected in *Stinson*. As the *Stinson* Court explained, "[d]ifferent analogies have been suggested as helpful characterizations of the legal force of commentary." *Id.* at 43. One of the suggested analogies the Supreme Court considered was *Chevron* deference. "Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)," the Court continued, "if a statute is unambiguous the statute governs; if, however, Congress' silence or ambiguity has left a gap for the agency to fill, courts must

19-13776                LUCK, J., Dissenting                    6

defer to the agency's interpretation so long as it is a permissible construction of the statute." *Stinson*, 508 U.S. at 44 (quotations omitted). The *Stinson* Court found the analogy to *Chevron* "inapposite" because "commentary explains the guidelines and provides concrete guidance as to how *even unambiguous guidelines* are to be applied in practice." *Id.* (emphasis added).

In other words, *Stinson* deference applies to the commentary even if the guideline it explains is unambiguous. Yet, the majority opinion applies *Kisor* to adopt the exact opposite deference standard for the commentary—the guideline must be ambiguous before the courts can even consider giving deference. Adopting the standard rejected by *Stinson* is overturning *Stinson*.

The majority asserts that "*Stinson* did not outright reject *Chevron* deference" but only rejected "the 'analogy' between an agency's interpretation of a statute and the commentary's interpretation of a [g]uideline." Maj. Op. at 15 n.7. But the *Stinson* Court explicitly noted that, under *Chevron*, courts must defer to an agency's permissible interpretation of a statute where "Congress' silence or ambiguity has left a gap for the agency to fill." *Stinson*, 508 U.S. at 44 (quotations omitted). The Court rejected this test because commentary (unlike agency regulations interpreting statutes) can "provide[] concrete guidance as to how *even unambiguous guidelines* are to be applied in practice." *Id.* (emphasis added). The Supreme Court rejected the *Chevron* test. That's the same test the majority adopts here today.

After applying *Kisor* to the guidelines commentary, the majority opinion has demolished *Stinson*'s holding. The majority opinion no longer presumes that the commentary is authoritative. And the majority opinion no longer defers to the commentary if the guideline it interprets will bear the construction. The majority opinion has overturned and set aside *Stinson* without using the o-word or a-word. But an abrogation by any other name is still an abrogation.

The majority opinion avoids using the o- or a-word because, as an inferior court, we cannot overrule or abrogate a Supreme Court decision. Only the Supreme Court can abrogate or overrule one of its decisions—"it is [that] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (same); *United States v. Hatter*, 532 U.S. 557, 567 (2001) (same).

But, as the *Kisor* Court noted, it didn't overrule anything. The "only question presented" in *Kisor* was "whether" the Supreme Court "should overrule" *Auer* or *Seminole Rock*, "discarding the deference they give to agencies." *Kisor*, 139 S. Ct. at 2408. The Court answered "no." *Id.* And, as Chief Justice Roberts explained, the Supreme Court "took [*Kisor*] to consider whether to overrule *Auer* and *Seminole Rock*. For the reasons the Court discusses . . . I agree that overruling those precedents is not warranted." *Id.* at 2424 (Roberts, C.J., concurring in part).

The majority insists that it is not overturning *Stinson* but "honor[ing] *Stinson*'s instruction to 'treat[]' the commentary 'as an

agency's interpretation of its own legislative rule.'"  Maj. Op. at 14 (quoting *Stinson*, 508 U.S. at 44).  But the majority is abandoning the test *Stinson* required and adopting the test *Stinson* rejected.  We are bound by the Supreme Court's holdings until it tells us otherwise.

Because the Supreme Court didn't overrule *Stinson* in *Kisor*, the *Stinson* deference standard to the commentary remains good law.  And so do our cases—*Weir* and *Smith*—applying *Stinson* deference to the definition of "controlled substance offense."

*The* Kisor *Clarification Does Not*
*Apply to* Stinson *or the Commentary*

Even putting aside the improper overruling of *Stinson*, the majority opinion's *Kisor* "clarification" does not apply to *Stinson* and the guidelines commentary.  None of the three reasons the majority opinion gives for why the *Kisor* "clarification" applies to *Stinson* and the commentary is persuasive.

First, the majority opinion says that the *Kisor* clarification applies to *Stinson* because there's no indication that *Kisor* distinguished between agency rules and the commentary to the guidelines.  But, as the majority opinion concedes, "*Kisor* did not concern the [s]entencing [g]uidelines."  Maj. Op. at 11.  And *Kisor* never mentioned the commentary or the sentencing guidelines.  The Supreme Court doesn't upend decades of precedent through silence.  *Cf. United States v. Florida*, 938 F.3d 1221, 1226 n.4 (11th

Cir. 2019) ("We do not consider the Supreme Court's silence on an issue that was not presented dispositive.").

Even if we could imply something from silence, the Supreme Court has not been silent about the distinctions between the guidelines commentary and agency rules. In *Stinson*, the Court explained that the "[c]ommentary . . . has a function different from an agency's legislative rule. Commentary, unlike a legislative rule, is not the product of delegated authority for rulemaking, which of course must yield to the clear meaning of a statute." *Stinson*, 508 U.S. at 44. "Rather, commentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." *Id.*

And the Supreme Court has not been silent about the distinctions between the sentencing commission and administrative agencies. "The [s]entencing [c]ommission," the Supreme Court has explained, "unquestionably is a peculiar institution within the framework of our [g]overnment" with "an unusual hybrid in structure and authority." *Mistretta v. United States*, 488 U.S. 361, 384, 412 (1989); *see also id.* at 425 (Scalia, J., dissenting) ("[H]ere we have an anomaly beyond equal: an independent agency exercising governmental power on behalf of a [b]ranch where all governmental power is supposed to be exercised personally by the judges of courts." (footnote omitted)). Unlike with agency rules, "the sentencing function long has been a peculiarly shared responsibility among the [b]ranches of [g]overnment and has never been thought of as the exclusive constitutional province of any one [b]ranch." *Id.*

at 390 (majority opinion).  Under the Sentence Reform Act, "Congress' decision to place the [c]ommission within the [j]udicial [b]ranch reflected Congress' strong feeling that sentencing has been and should remain primarily a judicial function." *Id.* (quotation omitted).

Second, the majority opinion says that *Kisor* recognized that the commentary should be treated as an agency's interpretation of its own legislative rules by "includ[ing] *Stinson* alongside administrative agency cases in a list of '(pre-*Auer*) decisions applying *Seminole Rock* deference.'"  Maj. Op. at 13.  The majority opinion quotes from footnote three in *Kisor*.  But footnote three is in the part of *Kisor* that failed to get a majority.  Chief Justice Roberts—the deciding vote in *Kisor*—did not join footnote three or anything else in that section of the opinion.  And *Stinson* and the guidelines are not mentioned in the parts of *Kisor* that Chief Justice Roberts did join.  The footnote in *Stinson*—which couldn't garner a majority—cannot support the majority's position here.

Third, the majority opinion uses the transitive property to find that the *Kisor* clarification applies to *Stinson*.  "*Stinson* adopted *Seminole Rock*'s formulation of agency deference," the majority opinion explains, "[s]o it follows that *Kisor*'s clarification of *Auer* deference applies to the [g]uidelines and its commentary."  *Id.* at 13.  In other words, because X relied on Y, and Y has been clarified by Z, then X must also have been clarified by Z.

But the Supreme Court has rejected this kind of transitive reasoning to alter its decisions.  For example, in *Evans v. Gore,* 253

19-13776               Luck, J., Dissenting               11

U.S. 245 (1920), "Judge Walter Evans challenged Congress' authority to include sitting federal judges within the scope of a federal income tax law that the Sixteenth Amendment had authorized a few years earlier." *Hatter*, 532 U.S. at 566. The Supreme Court agreed with Judge Evans, holding "that the Compensation Clause barred application of the tax to Evans, who had been appointed a judge before Congress enacted the tax." *Id.*

"A few years later," in *Miles v. Graham*, 268 U.S. 501 (1925), "the Court extended *Evans*, making clear that its rationale covered not only judges appointed before Congress enacted a tax but also judges whose appointments took place after the tax had become law." *Hatter*, 532 U.S. at 566. But "[f]ourteen years after deciding *Miles,* th[e Supreme] Court overruled" it in *O'Malley v. Woodrough,* 307 U.S. 277 (1939), although the "Court did not expressly overrule *Evans* itself." *Hatter*, 532 U.S. at 566–67.

The Federal Circuit confronted the continued viability of *Evans* in *Hatter*. In 1965, when Medicare was created, Congress "required most American workers (whom Social Security covered) to pay an additional Medicare tax." *Id.* at 561. But Congress "did not require [f]ederal [g]overnment employees (whom Social Security did not cover) to pay that tax." *Id.* "In 1982, Congress . . . extended both Medicare eligibility and Medicare taxes to all currently employed federal employees as well as to all newly hired federal employees." *Id.* The extension "meant that (as of January 1, 1983) all federal judges, like all other federal employees and most other citizens, would have to contribute between 1.30% and 1.45% of

their federal salaries to Medicare's hospital insurance system." *Id.* at 562.

"[E]ight federal judges, all appointed before 1983, sued the [g]overnment for 'compensation' in the United States Claims Court. They argued that the 1983 law, in requiring them to pay Social Security taxes, violated the Compensation Clause." *Id.* at 564. The Federal Circuit agreed, holding that the Compensation Clause "prevent[ed] the Government from collecting certain Medicare and Social Security taxes from a small number of federal judges who held office nearly 20 years ago—before Congress extended the taxes to federal employees in the early 1980's." *Id.* at 560–61. The Federal Circuit explained that the Supreme Court had not "expressly overrule[d] *Evans*," and, "if changes in judicial doctrine had significantly undermined *Evans*' holding, th[e Supreme] Court itself would have overruled the case." *Id.* at 567 (quotations omitted). Because the eight judges appointed before the 1983 law were "like *Evans* (involving judges appointed *before* enactment of the tax), [and] not like *O'Malley* (involving judges appointed *after* enactment of the tax)," the Federal Circuit "held that *Evans* controlled the outcome." *Id.*

The Supreme Court affirmed that the Federal Circuit did exactly what it was supposed to do. The Federal Circuit, the Court explained, "was correct in applying *Evans* to the instant case." *Id.* Even if the earlier precedent rested on an "increasingly wobbly, moth-eaten foundation[]," when it comes to "continuing respect under the doctrine of stare decisis," the "[c]ourt of [a]ppeals was

correct in applying that principle" because "it is th[e Supreme] Court's prerogative alone to overrule one of its precedents." *Khan*, 522 U.S. at 20.

"If a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [c]ourt of [a]ppeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). That is, Supreme Court "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998). "[W]e are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court." *Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996).

We must do to *Stinson* what the Federal Circuit did with *Evans*—apply it even if we have doubts about its continued vitality. Even though *Kisor* clarified *Seminole Rock*, and *Stinson* relied on *Seminole Rock*, we must follow *Stinson* because it directly controls the deference we owe to the guidelines commentary, regardless of *Stinson* resting on an increasingly wobbly, moth-eaten foundation.

There's another problem with the majority opinion's transitive precedent theory. While the *Stinson* Court used *Seminole Rock* as an analogy to describe the deference courts owe to the

guidelines commentary, *Stinson* was careful to note that "the analogy [was] not precise because," unlike for agencies, "Congress has a role in promulgating the guidelines." 508 U.S. at 44. That's why *Stinson* gave more deference to the guidelines commentary than *Seminole Rock* gave to an agency's interpretation of its own regulations.

*Seminole Rock* deference applied to an agency's interpretation of one its regulations "if the meaning of the words used [were] in doubt." 325 U.S. at 413–14 ("Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt."). But *Stinson* went further. The commentary, *Stinson* said, "is authoritative" and "explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." *Stinson*, 508 U.S. at 38, 44. Unlike in *Seminole Rock*, the meaning of the guideline didn't have to be in doubt for the commentary to be authoritative.

Also, under *Seminole Rock*, an agency's interpretation of its regulations was given "controlling weight unless it [was] plainly erroneous or inconsistent with the regulation." 325 U.S. at 414. *Stinson* goes further with the guidelines commentary. Under *Stinson*, the sentencing commission could amend or revise the guidelines by amending the commentary. "Although amendments to guidelines provisions are one method of incorporating revisions, another method open to the [c]ommission is amendment of the commentary, if the guideline which the commentary interprets will bear the

19-13776                LUCK, J., Dissenting                15

construction."    *Stinson*, 508 U.S. at 46.    An agency, by contrast, can't amend its regulations through an interpretation.[1]

_____

[1] In a footnoted afterthought, the majority opinion concludes (without any analysis) that the commentary to guideline section 4B1.2(b) fails even under *Stinson* deference—without the *Kisor* clarification.  Maj. Op. at 22 n.9.  The majority says that, even under *Stinson*, the guidelines here "could not bear" the commentary because section "4B1.2(b)'s text exclude[s] inchoate crimes."  *Id.*  But section 4B1.2(b)'s text does not exclude conspiracy, attempt, and aiding and abetting crimes.

The sentencing commission knows how to exclude crimes in the text of the guidelines.  In guideline section 3D1.1(b)(2), the commission "[e]xclude[d]" from the grouping rules, for example, counts of convictions for aggravated identity theft under 18 U.S.C. section 1028A.  *See id.* § 3D1.1(b)(2).  And, in guideline section 4A1.2(c), the commission "[e]xcluded" fish and gaming violations, and hitchhiking, loitering, public intoxication, and vagrancy convictions from being considered in computing criminal history.  *See id.* § 4A1.2(c)(2).  The text of section 4B1.2(b), by contrast, didn't "exclude" anything. *See United States v. Perez*, 366 F.3d 1178, 1182 (11th Cir. 2004) ("Where the same language appears in two guidelines, it is generally presumed that the language bears the same meaning in both.  It is also generally presumed that the disparate inclusion or exclusion of language is intentional and purposeful." (citation omitted)).

It's hard to tell from the few lines in the footnote, but, essentially, the majority opinion smuggles the *Kisor* ambiguity test into the *Stinson* deference standard.  The majority opinion reaches the conclusion that it does because it reads section 4B1.2(b) as "unambiguously exclud[ing] inchoate offenses."  Maj. Op. at 16.  But, unlike in *Kisor*, ambiguity is not the test under *Stinson*.  As the *Stinson* Court explained, "commentary explains the guidelines and provides concrete guidance as to how *even unambiguous guidelines are to be applied in practice*."  508 U.S. at 44 (emphasis added).  That is, a guideline can be unambiguous and we would still give deference to the commentary explaining it

*Conclusion*

Court decisions are not like statutes.  They are not subject to amendment, and they are not implicitly repealed.  If the Supreme Court wants to clarify its decisions, as it did with *Seminole Rock* and *Auer* in *Kisor*, it knows how to say which decisions are clarified.  And if it wants to overrule one of its holdings, it knows how to do that too, as it did in *Hatter*.  But, until the Court tells us that it is clarifying *Stinson* like it did for *Seminole Rock* and *Auer*, or that it is overruling *Stinson*, we are bound to apply *Stinson*'s holding to the guidelines commentary.

The majority opinion "think[s] the only way to harmonize" *Stinson* and *Kisor* "is to conclude that *Kisor*'s gloss on *Auer* and *Seminole Rock* applies to *Stinson*."  Maj. Op. at 11.  That is one way, but it is not the only way, and, more importantly, it is not faithful to how the Supreme Court has told us to read its decisions

---

and providing examples of how the guideline is to be applied in practice (like when the prior conviction is for an inchoate crime).

Because "[t]he [c]ommission . . . drafts the guidelines as well as the commentary interpreting them, . . . we can presume that the interpretations of the guidelines contained in the commentary represent the most accurate indications of how the [c]ommission deems that the guidelines should be applied to be consistent with the [g]uidelines [m]anual as a whole as well as the authorizing statute."  *Id.*  The majority opinion's footnote goes astray because it doesn't do what it says it does—apply *Stinson*, unvarnished and unclarified.  The footnote never grapples with the presumption that the commentary to section 4B1.2(b) is the most accurate indication of how the sentencing commission deemed the guideline should be applied.

19-13776                    Luck, J., Dissenting                    17

that have been undermined but not directly overruled by later cases. The other way to harmonize *Stinson* and *Kisor* is to apply *Stinson* to the "commentary in the [g]uidelines [m]anual that interprets or explains a guideline," 508 U.S. at 38, and *Kisor* "to agencies' reasonable readings of genuinely ambiguous regulations," 139 S. Ct. at 2408, until the Supreme Court tells us that *Stinson* has been overruled or clarified out of existence.

Because the *Kisor* clarification does not apply to *Stinson*, *Kisor* is not "irreconcilable" with *Weir* and "incongruous" with *Smith*. Maj. Op. at 21 n.9. "[A] conviction of conspiracy to possess with intent to distribute" heroin and cocaine remains "a 'controlled substance offense' for purposes of career criminal sentence enhancement under section 4B1.1 of the" guidelines. *Weir*, 51 F.3d at 1031. I would affirm the defendant's sentence.